**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

                                    Case No. 06-20137

**v.**

                                    **DENISE PAGE HOOD**

**YOUSEF SAFIEDINE,**

    **Defendant.**

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I. INTRODUCTION**

On March 14, 2006, Yousef Safiedine was indicted on three counts of Making and Subscribing a False Federal Income Tax Return, in violation of 26 U.S.C. §7206(1). The Indictment alleges that Safiedine made and subscribed a false federal income tax return on or about March 17, 2000 (Count One), April 10, 2001 (Count Two), and March 29, 2002 (Count Three). In each count, it is alleged that Safiedine reported $134,000 on rental income on Schedule E, but that in 2000 the actual rental income that should have been reported for calendar year 1999 was $190,000; in 2001 the actual rental income was $168,000 for calendar year 2000; in 2002 the actual rental income was $205,000 for calendar year 2001.

On November 20, 2006, Safiedine filed a notice of his intent to present evidence of his mental condition at his trial on these charges. On November 6, 2007, he waived his constitutional right to a trial by jury and proceeded with a bench trial before this Court. On January 11, 2008, the Court issued its oral finding that Safiedine was guilty as to all counts. The following is the Court's written Findings of Fact and Conclusions of Law.

**II. FINDINGS OF FACT**

It is undisputed that Safiedine reported $134,000 of rental income for the calendar years 1999, 2000 and 2001. Paul Crowley, Court Witness Coordinator from the Internal Revenue Service ("IRS") Service Center in Andover, Massachusetts, testified that each of Safiedine's tax returns for 2000, 2001 and 2002 were signed under penalty of perjury and listed in Schedule E, rents received of $134,000. No IRS Form 1099s filed with the IRS supported this income, nor were IRS Form 709s filed relative to this income or any other income of Safiedine.[1] Safiedine's tax returns are also signed by his wife, Nahla Safiedine. The IRS Court Witness Coordinator also testified that estimated payments were reflected on the tax return.

Safiedine's tax returns, federal and state were prepared by a Certified Public Accountant, Judith Rosso, of Cech Rosso and Company. This firm had prepared Safiedine's tax returns for over twenty years. (Larry Wright, the owner of the predecessor firm, had filed earlier returns for Safiedine and was Safiedine's first contact with the firm.) Ms. Rosso testified that Safiedine's tax returns for the years 2000, 2001 and 2002 were completed by telephone and by mail. Safiedine had not appeared in person at the CPA office in over 10 years. Ms. Rosso stated that she sent Safiedine a tax organizer from her firm and he returned it completed, by mail, and that she had a telephone conversation with him each year. Each year, he indicated the rental income was "SALY" ("same as last year"). She noted that, at some point, the rental income had gone from $144,000 to $134,000 because he stated there was no mortgage interest remaining. Ms. Rosso never received any checks or record of deposits to support the rental income. She never saw a lease or other rental agreement. She was never advised of any gifts Safiedine received from his relatives or asked to file anything

---

[1] IRS Form 1099 is a form used to report income other than wages, tips and salaries. IRS Form 709 is the United States Gift (and Generation - Skipping Transfer) Tax Return.

relative to gift income or excise taxes. She did not complete any financial statements for him or any business income tax returns. Ms. Rosso never went over the tax returns, line by line, with either Safiedine or his wife.

Ms. Rosso testified that her first impression of Safiedine was that he was a well dressed, professional looking man. She also testified that her impression of Safiedine changed over time and after he told her the story of his involvement with Sun Oil Co. and how he was to become its owner. When he talked about Sun Oil, he became very "agitated and angry", "yelling and belligerent" such that she became "somewhat afraid." He was not rational about this and she indicated that to him. Ms. Rosso had not talked to Safiedine in person in over ten years. She noted that, on the several times she spoke to him on the telephone, little time was spent talking about the tax return; most of the time he talked about Sun Oil. She testified that he believes he is the owner of Sun Oil.

Thomas Hogue of Huntington Bank in Mount Clemens, Michigan, testified regarding the deposits from JLJ and MTK Investment into the account of Nahla Safiedine, Defendant's wife. (Hassan Safiedine, the Safiedine's adult son, jointly holds this account with his mother.) Monthly, since January 1999, deposits have been made into this account in the amount of $15,000 from one of these two companies. (On one occasion, a check from JLJ was deposited, then returned for insufficient funds; it was replaced with a check from MTK Investment.) There is no indication on the checks of the obligation for which the money is paid to Nahla Safiedine.

JLJ and MTK are companies owned by Safiedine's family. The principal for these companies is Kazim Safiedine, Defendant Safiedine's brother. Defendant Safiedine, in the 1970s to the early 1980s, owned and operated a number of gasoline stations. Prior to that time, he had worked on the assembly line for Ford Motor Company. These gasoline stations were located at

prime locations in the Detroit metropolitan area. Safiedine purchased his first gasoline station, a Mobil branded station, in 1973. He owned seven stations over the years, until 1984 when he sold all of the stations, several to his brother, Kazim Safiedine. Around 1981, Safiedine claims he was accused of "mixing" gasoline, but the claim was never proven. About this time, he also claims to have had several problems with his stations, including the shooting death of an employee. During the time he owned the gasoline stations, Safiedine also failed to pay federal excise taxes, in the amount of $273,634.04 in 1984 (Exhibit 4A) and $90, 924,92 in 1985 (Exhibit 4B). James Cummins, a retired IRS Revenue Officer, who had worked to recover this delinquent tax, testified that certain property had been seized to pay these taxes, but was released when the true owner was discovered. A civil judgment was secured for these delinquent taxes in 1997. Defendant Safiedine also told his story of owning Sun Oil to Agent Cummins. Cummins thought he was trying to antagonize him but handled him "smoothly" even though he found his story preposterous.

Cummins also testified that on the IRS Collection Information Statement for Individuals (Exhibit 55A), dated June 6, 2001, which described his income, Safiedine had listed income of $20,000 family support from his brothers and mother. This form was signed in Cummins' presence. During his continued conversation with Safiedine, Cummins stated that Safiedine indicated he received $17,000 per month lease income plus monthly gifts from his family: $8,000 to his wife and $12,000 to himself from his two brothers and his mother. (See Exhibit 55C) Cummins noted Safiedine's expenses were inconsistent with his income. Cummins found Safiedine's story about Sun Oil and the money Safiedine was owed from that company preposterous. He thought Safiedine was "acting crazy", but that it was an "act." Cummins perceived that Safiedine had a history of success in business, that he was smart and tough despite his wildly inconsistent comments.

4

Gabriel Schuch, an agent with the IRS, interviewed Safiedine on July 25, 2002, after advising Safiedine of his constitutional rights regarding the interview. Safiedine told Schuch he then owned one gasoline station, although he had previously owned seven stations in the 1980s. The station Safiedine currently owns was leased to a brother for $12,000, paid by check each month. Safiedine noted he also received $3,000 from his brother, "Jim," Kazim Safiedine. Schuch's interview was conducted as part of a larger investigation of JSC Corporation and other Safiedine family members. Safiedine could not provide a written lease. Safiedine did tell Schuch about the Sun Oil deal and Schuch's IRS notes reflect this in Paragraph 5.

IRS Special Agent Anthony Ramos testified that he was the lead agent in a larger investigation, of which Safiedine's interview was a part. This investigation included, in part, several interviews and a search warrant on the gasoline station located at 12841 Michigan Avenue in Dearborn, Michigan, which Safiedine leases to his brother. JSC Corp. is listed on the door to the gas station office and quick change oil shop. Mary Fawaz is the bookkeeper for Kazim Safiedine. One hundred sixty-five boxes of records were seized. Part of MTK and JLJ records were seized as well. Among the records were numerous cancelled checks to Nahla Safiedine for the years 1999, 2000, and 2001. The monthly checks increased over the three years from $17,000 to $18,000. Ramos summarized the documents, noting unreported income of $56,000 in 1999, $34,000 in 2000 and $71,000 in 2001.

Subsequent to Schuch's interview and the execution of the search warrant, Agent Ramos interviewed Safiedine in Ramos' office when Safiedine appeared to be fingerprinted and to give handwriting exemplars. Both Safiedine and his wife, Nahla, were read their constitutional rights and interviewed. Agent Ramos interviewed Safiedine while Nahla Safiedine was interviewed by other

5

officers.

Safiedine told Agent Ramos the one gasoline station he still owned was leased to his brother for $12,000, that the lease amount had not changed, and that the remaining $6,000 received was a "gift" to "help him out." Agent Ramos testified there is no indication of such a split on the checks. Safiedine also stated he received $3,000 per month from his brother Jim (Kazim Safiedine) and $3,000 from his mother, all in cash separate from the checks to Nahla Safiedine. The checks were made to Nahla Safiedine to avoid state levy. (This statement was consistent with Defendant's statement to Agent Cummins.)

Agent Ramos noted checks in 1999 were received from MTK or JLJ (usually for $15,000); in 2000 and 2001, the checks were issued by JLJ, except on one occasion when a check was issued from MTK. This check appeared to be a replacement for a check from JLJ which was returned from the bank. During his investigation, Agent Ramos never found a written agreement nor any IRS Form 1099s to either Safiedine or his wife. He did find that Safiedine was estranged from his family and thought to be a recluse who engaged in day trading. Agent Ramos never attempted to verify or discredit Safiedine's Sun Oil story by contacting anyone at Lehman Oil, Sun Oil or Michigan National Bank. Ramos testified that Safiedine had asked his assistance in obtaining his money from Sun Oil. Even so, Ramos did not investigate any mental health issues that Safiedine may have had.

Louis Barton, an IRS Revenue Agent, also testified to the recalculation of Safiedine's tax liability. Barton had extensive IRS and financial background and education. He had previously audited "a few hundred" IRS Form 1040 returns. He was allowed to testify as an expert in tax computation. He noted he would treat all of the $17,000 or $18,000 received by Safiedine as rental income or lease income for tax purposes. Since Safiedine and his wife filed their tax return jointly,

6

those amounts would be treated as taxable income to each even though the checks were made only to Nahla Safiedine. Barton testified that it was unusual for a corporation to include rental/lease payments in the same check as a gift. Gifts, in his experience, are often used to disguise income. Barton further testified to the lack of an IRS record of these payments as gifts. He noted that up to $10,000 per year per individual is allowed by the IRS as a gift. There are no IRS Form 1099s for 1999, 2000 or 2001 indicating gifts to Safiedine or his wife. Barton also indicated that the tax deficiency amounted to $45,125.00.

Nahla Safiedine has been married to Safiedine for 30 years and has two children with him, ages 29 and 23 at the time of trial. Safiedine had four other children prior to his marriage to Nahla Safiedine. One child died five years ago by suicide; another died of an overdose of medication. The other two children suffer mental health problems. Although she claimed to defer to her husband and to be anxious since the IRS visited their home, such was not apparent from her testimony or her demeanor on the witness stand. Nahla Safiedine claims her husband does not believe in mental illness and believes the children from his first marriage merely resented his second marriage. She testified that Safiedine believes he is owed 1-10 billion dollars from Sun Oil. In anticipation of that, she claims he sold their gasoline stations, keeping only one station, the one that is leased to his brother. Nahla testified that for the past twenty-five years, Safiedine has believed he will get money owed to him by Sun Oil. In fact, she claimed that Safiedine believed they were picking up the check when they came to court. She stated he believes Agent Ramos is his friend and took their daughter to the IRS meeting under the belief that he was going to receive his money on that day. Nahla Safiedine stated that her husband has not worked in twenty-five years.

Nahla Safiedine confirmed that the gas station is rented by her brother-in-law for $12,000

7

per month. The excess in the monthly checks is help to her family because her husband does not work. Nahla Safiedine claims she never reviewed the tax returns; she merely signed where indicated because she trusts her husband. She admitted she had falsely stated her occupation, but stood by her story that $12,000 was rental income and the amounts over $12,000 were "gifts" as explained by her brother-in-law. Nahla Safiedine stated over and over "it is a family thing." Her testimony in this regard is unsupported by other than these self serving comments. She never indicated any reason why the gift money is included in the corporate checks; she never stated any reason for the differing amounts in the checks; she never indicated that any family member told her the excess money in the checks was a gift. She also testified her family and her husband's family gave her other money and that she borrowed money from her mother. She downplayed the value of her home and the property values in her neighborhood, as well as the fact that she drives a luxury vehicle and that her husband's family gave him a Jaguar as a gift.

Safiedine described himself as a very successful businessman for all his life. The Court agrees with that. Even the Government admits that Safiedine is truthful when he says that he pioneered the self service gasoline station concept. Safiedine indicated that certain Mobil executives offered to help him with his concept. He also testified that Sun Oil wanted him to partner with him and he was promised a controlling interest in Sun Oil. Safiedine said he expected 30 million shares of Sun Oil and he is still looking for money from Sun Oil. Safiedine detailed what he believed to be his agreement with Sun Oil. During his direct testimony, Safiedine rambled significantly about his interaction with Sun Oil.

Safiedine admitted that he had been accused of mixing gas but that an "EPA judge" found that no bad gas had been proven. He also admitted his sales tax problems with the State of

Michigan, but seemed to blame this problem on a person at Mobil who had suggested that he could better compete as an independent station by cutting expenses and not paying sales tax. He noted that the oil company had indicated that it would pay the tax.

Safiedine testified that his 1999, 2000 and 2001 tax returns were accurate. He admitted that Judith Rosso prepared the tax returns and that he had last seen her in person in 1990 or 1991. He noted that he had read everything that she had sent to him. Safiedine further stated that he had reported $12,000 as income from the gas station and that the remainder of the money had been given to him by his extended family to assist his immediate family, his wife and children. He noted that he had explained all of this to Agent Cummins when Cummins had visited him. Like his wife, Safiedine offered no explanation for the gift money being included in the corporate check for the rental of the station. He offered no reasons for the differing amounts of the checks and provided no documents or other evidence to support that the excess money over the $12,000 rent per month was a gift.

On cross examination, Safiedine rambled much less in his testimony, answered questions much more directly and focused much more on the issues in the case. Cross examination confirmed he lives in a suburban home that he purchased in 1994 before his numerous gas stations were sold off or near that time. Successful business people live in the neighborhood.

Safiedine described himself as a self-made man, having started with Ford Motor Company as an assembly worker. As a result of his interest in cars and his abilities as a mechanic, he opened his first gasoline station, a Mobil gas station, at the corner of Fenkell and Greenfield in the City of Detroit in 1973. At the height of his business ventures, Safiedine owned seven gas stations in prime locations in and around Detroit. In 1984, Safiedine sold all of the stations except one. This was

9

following his tax problems with the State of Michigan. The State apparently attempted to seize the stations but they had been transferred to[2] his brothers.

During the development of the seven stations, Safiedine improved his management practices, at one time employing up to five managers at branded stations and ultimately employing the self-service process he created. Safiedine exhibited a keen sense of the current business, remarking on the prime locations of the stations he had owned, the businesses nearby, the businesses' worth and the current business environment of at least the one station that he continues to own. All this, even though his testimony and that of his wife is that he spends most of his time in the basement on the computer investing in the stock market, which he claims he has studied.

Safiedine testified that he had no problems with the IRS until Agent Ramos became involved. He explained the purchase arrangement with his brothers, the original lease being $12,000 with his brother-in-law. Thereafter, although his testimony is a little confused, he stated he was given $3,000, as $100,000 was still owed on the other three stations he had sold. Safiedine admitted his family leased a vehicle for him and that he had credit card debt and had refinanced his home as a result off $400,000 he lost investing.

When pressed by the Government's counsel about the taxability of the amount over $12,000 per month received from his brother, Safiedine resorted to his story about Sun Oil. He could not adequately respond about whether treating the $6,000 as a gift had any benefit to his brother, Kazim Safiedine. At the end of his testimony, Safiedine asked whether one billion dollars would be

---

[2] Defendant admitted that he appeared in court cases before Judges Horace Gilmore and John Feikens of this Court. He was found not guilty before Judge Gilmore and found responsible for taxes due and owing in a civil case before Judge Feikens.

released to him that day.

The defense presented the testimony of Dr. Charles Clark, a forensic psychologist from the Center for Forensic Psychology. Dr. Clark has previously been qualified as an expert witness in this area by this Court and other federal courts. He evaluated Safiedine at the Safiedine home on September 12, 2006. He spent four hours with Safiedine during which time he interviewed Safiedine, performed a mental status evaluation, reviewed his history and administered psychological tests to defendant including the PAI (Personality Assessment Inventory). Dr. Clark also listened to Safiedine's in-court testimony. Dr. Clark testified that what he had heard during the testimony was similar in manner and content to what he had heard in his September interview with Safiedine. The same general themes regarding Sun Oil, distorted accounts of his meetings with the IRS and difficulty getting answers were observed by Dr. Clark. Dr. Clark found this mental thought disorder was extremely difficult to feign. Such thought processes he found to be governed by a central grandiose or persecutorial delusion, that of a great but failed businessman with a government conspiracy against him. The doctor noted that Safiedine shifts back and forth between reality and delusion, noting that Safiedine has a difficult time understanding reality and some of his beliefs are irrational, but truly held. Dr. Clark noted that Safiedine was cognitively intact in time, space and sense, but shifting between reality and delusion and that this behavior probably began in the 1980s.

Psychological disorders, such as schizophrenia, hallucinations, major affective disorder and depression, were ruled out by Dr. Clark. His diagnosis was that Safiedine had a thought disorder and a delusional disorder that was not episodic, but continuous. Dr. Clark indicated that Safiedine wanted to demonstrate that he was not crazy, but that he was owed billions of dollars. Dr. Clark also noted that Safiedine could do a number of things such as: fill a prescription at the pharmacy; go to

the grocery store and shop with a list; do banking, including make a deposit and recognize an error in the transaction; and exaggeration.

On cross examination, Dr. Clark was challenged as to why Safiedine submitted to an examination if he believed nothing was wrong with him. Dr. Clark indicated that Safiedine wanted to demonstrate that he was not crazy, but that he was owed billions of dollars. Dr. Clark noted that Safiedine was not feigning or malingering. Safiedine fails to understand the adversarial nature of things, according to Dr. Clark. However, Dr. Clark could not rule out criminal acts nor could he say that Safiedine did not understand that treating part of the payments from his brother as gifts would be advantageous to his tax position. Nonetheless, Dr. Clark persisted that Safiedine was not thinking logically and that his wife goes along with his story so as not to confront him.

## III. CONCLUSIONS OF LAW

The elements of the charges against Safiedine require that the Government show:

> 1. Defendant willfully made and subscribed a tax return;
> 2. The return contained a written declaration that it was made under penalties of perjury; and
> 3. Defendant did not believe the return to be true and correct as to every material matter.

*United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002). In this case, the Government alleges that Safiedine understated the amount of rental income received from his family for calendar years 1999, 2000, and 2001.

There is no dispute that Safiedine and his wife read and signed the tax returns in question and that the form indicated that the written declaration was made under penalty of perjury. (See Exhibits 1, 2, 3 Form 1040s United States Individual Income Tax Returns for 1999, 2000, 2001.) There is no dispute that Nahla Safiedine received certain checks from her brother-in-law through

12

JLJ and MTK Enterprises in the amounts listed on Exhibits 44-A to 46-L, and summarized on Exhibits 47, 48, 49 by year and as a bar chart on Exhibit 50. The total amounts being: $190,000 in 1999; $168,000 in 2000; and $205,000 in 2001, equaling $563,000. There is no dispute that $12,000.00 per month of the amount received was reported to the tax preparer as lease income to be reported on the joint tax return of Safiedine and his wife, Nahla Safiedine. That amount, over a number of years, was $144,000 or 134,000. There is also no dispute that, if the entire amounts of the checks received by Nahla Safiedine were treated as rental or lease income, there would be unreported income equal to that on Exhibit 56, along with the total amount of tax deficiency shown due and owing (1999, $16,446; 2000, $9,522; 2001, $19,157; equally $45,125).

Two questions arise: whether the tax return was willfully made; and whether Safiedine did not believe the return to be true and correct as to every material matter. Strict willful conduct is required in this case. Such willfulness means:

> [A] voluntary intentional violation of a *known legal duty* ... that defendant must have acted voluntarily and intentionally and with the specific intent to do something he knew the law prohibited, that is to say, with the intent to disobey or disregard the law. Negligent conduct is not sufficient to constitute willfulness.

*United States v. Abboud,* 438 F.3d 554, 581 (6th Cir. 2006). Willfulness is also described as bad faith, evil intent or want of justification. Ignorance is a defense. *Id.* In *Abboud*, the under-reporting was the result of sloppy bookkeeping and the illness of an employee. *Id.* In *Cheek v. United States*, the petitioner held a good faith belief or asserted that he held a good faith belief that the tax law was unconstitutional based on his indoctrination by a group and his own self study. *Cheek v. United States,* 498 U.S. 192, 199-202 (1991). The Supreme Court in *Cheek* noted that the good faith belief was not required to be reasonable, but only held in good faith. *Id.* at 202. The *United States v.*

*Bishop* case involved a person who owned a ranch with his father. *United States v. Bishop,* 412 U.S. 346 (1973). The ranch bookkeeper sent him the expenses and deductions and, on some occasions, the taxpayer neglected to adequately review the documents which resulted in some double-dipping which the court found was not willful. *Id.* at 349.

Two defenses to willfulness are raised by the Safiedine in this case: whether or not Safiedine had a good faith belief that he was not violating the tax law even if that belief was unreasonable; and whether Safiedine, because of his mental illness, had the requisite state of mind to willfully violate the statute.

The Court finds that Safiedine's belief, that the amounts sent by check from JLJ and MTK Corporations to Nahla Safiedine and her son, constituted a lease payment of $12,000.00 and that the remainder was a gift, was not a good faith belief. In support of this finding, the Court notes that there is nothing to support the Safiedines' self-serving testimony that the excess over $12,000.00 in these checks is a gift. There is no written lease agreement. (A Land Contract, dated May 17, 1985, for the sale of 3 properties on Eight Mile Road calls for $653,304.40, of which $353,304.40 would be paid in monthly installments of $5,000 "each or more at Purchaser's option ...", beginning June 17, 1985. (Exhibit 52)) Corporate checks are involved with no explanation of what portion of a check is designated a gift. The check amounts are inconsistent and written against two corporate entities owned by Safiedine's relatives. These checks appear to be lease/rent payments. Gifts would not likely be written against a corporate entity. There was no evidence of the manner in which other monetary gifts or support were made to the Safiedines (except for Safiedine's and his wife's testimony that the family purchased or leased a car for Safiedine). There are no Form 1099s delineating the status of these payments. Safiedine verbally reported this income to the tax preparer

14

and provided no supporting documentation. The checks are made to Mrs. Safiedine to protect the income. Mrs. Safiedine reported the full check amounts as income when applying for credit. Safiedine's willfulness is also supported by his prior actions to protect his gas stations from seizure for payment of back taxes, and his attempt to file a non-obligated spouse form to protect his spouse's income or to secure a possible refund from seizure for back taxes. Safiedine is an astute and successful businessman and had previously been involved in tax problems. All of these facts point to Safiedine's willful behavior with respect to the charges in the Indictment.

With respect to Safiedine's claim that his delusional thinking prevents him from intentionally and voluntarily filing a false income tax return, the Court finds that Safiedine's responses on cross examination were much more direct and controlled. Safiedine appeared to become non-responsive and to offer "delusional" responses to avoid answering some questions posed by the Government's attorney. His answers to questions pertaining to the lease payments and taxes in controversy were not unusually non-responsive or delusional in this Court's view. Safiedine seemed to understand the questions posed by both his attorney and the Government's attorney and to particularly respond to the Government's attorney on the issue of inquiry. Safiedine was aware of why he had faced prior tax obligations and how to protect himself, or at least attempt to protect himself, from liability. He understood that he is obligated to pay taxes and responded to his tax preparer, including paying interim estimated taxes. Safiedine clearly testified that his wife never looked at the tax returns but merely signed them and relied on his representations to her about the tax returns.

Safiedine's mental diagnosis does not support his claim that he actually lacked the "willfulness" required at the time of the offense. There is some claim that the good faith belief that this part of the income from the corporate checks is a gift is a good faith belief, even though

15

unreasonable, because of his mental diagnosis. However, only the testimony of Safiedine and his wife support this conclusion. The testimony of Dr. Clark may be viewed to support that Safiedine holds in good faith this belief that the payment is a gift; however, even Dr. Clark could not rule out criminal acts or that Safiedine did not understand that treating a part of the payments as a gift would have a tax advantage.

The Court notes that it seems clear that Safiedine and his wife are supported in some ways by their respective families apart from these apparent lease payments from JLJ and MTK corporations. However, the Court finds such support, as gifts, is not part of the checks received from these corporations as lease/rent payments. The Court reviewed the checks submitted by the Government as exhibits. As noted before, the amounts are, for the most part, consistent and increased somewhat consistently. For example, the 1999 checks are all the same amounts. (Exhibit 47) The check amounts in Exhibit 48 for the year 2000 are inconsistently paid in inconsistent amounts. The payments increase in a consistent time frame, with respect to the increase from $15,000.00 to $16,000.00. The increase from $16,000.00 to $17,000.00 occurs in February, 2001. (Exhibit 49) Then, on October 1, 2001, the amount paid was $17,000.00 and then $18,000.00, beginning on October 26, 2001. (Exhibit 49) There is no explanation for either of the increases or the time frames, but clearly nothing that supports a good faith belief that these payments include gifts to Safiedine or his family.

For the reasons stated above, the Court finds that Safiedine did not have a good faith belief, however unreasonable, that the payments from the JLJ or MTK corporations were gifts. The Court further finds that none of the testimony, including that of Dr. Clark, supports a finding that Safiedine's mental diagnosis prevented him from willfully subscribing a false tax return and that the

Government has shown beyond a reasonable doubt all the elements of Counts One, Two and Three of the Indictment. The Courts finds Safiedine guilty of these charges.

s/Denise Page Hood<br>
DENISE PAGE HOOD<br>
United States District Judge

DATED: October 18, 2010


I hereby certify that a copy of the foregoing document was served upon counsel of record on October 18, 2010, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry<br>
Case Manager